We have a motion to strike a portion of the reply brief and a response. We are going to accept the portion of the motion that responds to the material that was objected to. I would like to spend my limited time here on three points, really two of which require some discussion, and the third one I just want to make sure we have a clear understanding of the fate of the Doctrine of Equivalence in this case, if in fact you send it back. In fact, let me just take that one first. There was a statement in the appellee's briefs that DOE has been forfeited, a very broad statement, and I believe not intended to suggest that DOE is not an issue in the case for any purpose. As to this limitation, the sole limitation that's on appeal before you in this case, true, no Doctrine of Equivalence, but there's no occasion to extend that to any other limitations of the claims. The other two points that I want to spend my time on are, first of all, reviewing the critical intrinsic evidence that shows this claim construction is wrong. There's no disclaimer here. And secondly, to talk for a minute about the disclaimer cases that the appellees rely on, each of which is easily distinguishable. We deal with most of them in the briefs, but I think it's instructive to take a couple of examples to show just how comfortably on the case is by comparison to some of this Court's prior cases. MR. KNEEDLER. I'd like to throw you off your proposed course, but make sure, if you would, either you can do it now or later, I would like to save time to talk about the Stein reference and the discussion in the prosecution history of Stein. MR. KNEEDLER. Yeah. Well, let me just do that now. I mean, the most important thing, of course, is to answer the Court's questions. Stein, there are two issues with Stein, at least as I understand the briefing. One is whether what the applicant said about Stein in the prosecution history was a disclaimer of scope of the claims then pending. And the second issue, I think, is whether on the merits Stein, in fact, satisfies the limitations, either all the limitations of the claims or at least the limitation we're talking about here. That second point, I'm happy to address. Frankly, it's not before you. Whether Stein invalidates or not, depending on what construction you adopt, is not an issue in this appeal. The first point, though, is relevant to Apelli's backup argument, frankly, that there was a prosecution history disclaimer. And just to set the stage for that, as you know from reading the briefs in this case, in the District Court, Apelli's position was this case was a prosecution history disclaimer case, not really a specification-based disclaimer case. The District Court, of course, went a different direction. And so the appeal has sort of morphed into now primarily, for them, from their perspective, a specification disclaimer case, which we don't think is any better than their prior argument. And the prosecution history is a backup. But to get to your specific question about Stein, the remarks about Stein on which Apelli's relied were made in reference to what the examiner said Stein taught. Okay? So the first, we can look at the specific places in the prosecution history that might be instructive. 120 is one of the places. It shows up, I think, 1183. Is that the? No, not 1183. It's 1235. 120 and 1235 are the two places that I think that discussion is. You might have one of those. Right. So the first thing to note is that the examiner's objection, or rejection, excuse me, based on Stein was a 103 objection. It was an obviousness rejection. So even the examiner acknowledged that Stein did not show the communication link through third-party equipment through which the customer and the vendor communicated, which, of course, is a very significant concession in and of itself, because it shows that the examiner viewed Stein, which is it had nothing to do with actually providing Internet access for the customer or the vendor. Now, the examiner went on and said, frankly, in something that was difficult for the applicant to understand at the time, and I don't think it's gotten any better with age, it was a bit of a difficult statement to parse, that Stein, let me just find it, the examiner contends I'm on actually 119, Your Honor, is where we talk about what the examiner said. The examiner contends that modifying Stein, the modification of Stein, to provide the communication link, so modifying it to provide what you admit was missing, would have been obvious because it would have recognized the advantages of using the Internet as an electronic marketplace suitable to provide subscribers a global arena and so forth, and I guess it's not on that page, but the examiner also said, over on 120, in the third paragraph, that the examiner apparently based his obviousness rejection also on the contention that Stein does provide a system for payment, ellipsis, to subscribers by allowing access to the Internet. It might be better just to go directly to the examiner's remarks, rather than your material quoting. So that's on 113, if you want to do that. Okay, I was looking at 1227. Unfortunately, these show up in different places. If you're in the appendix, it's just a couple pages back on 113. So the middle paragraph there, Stein discloses all the elements except disclosing the communication link, so the examiner is saying, yes, I agree, Stein is missing this, it's a 103. However, Stein's invention does provide a system for payment of information products, and this is the part I was referring to as garbled, and Internet service to subscribers by allowing access to the Internet and to check subscriber status. It's fairly difficult to parse that, but the applicant reading that said, Mr. Examiner, you seem to be suggesting, and this is what I was referring to on 120, you seem to be saying that Stein provided for Internet access, provided Internet access to the customers. And that's not right. Your understanding of what Stein showed is not right. And it's that portion of the prosecution history that appellees focus on and say, that creates a disclaimer as to what you were saying your claims at the time required. And it wasn't that at all. The applicants were correcting the examiner's misunderstanding about a prior art reference. It had nothing to do with commenting on what the scope of the claims was at the time. Indeed, we know that because the examiner himself had said, he has the claims in front of him, and he says, I agree, Stein doesn't show this communication link through the third party equipment between the customer and the vendor. So that's really, that's really the, it's a little bit convoluted, I think, in part with all due respect to the way the examiner articulated what he thought Stein taught. But there's no statement by the applicants that talked about limiting the scope of the claim language response. Okay. So let me, since we started with the prosecution history, let me just deal with the intrinsic evidence a little bit in back order. It might be more efficient to do that. In the 739 prosecution, of course, there's this discussion about Stein. There also is the section where the applicants give specific examples of what it means to provide a communications link through third party equipment. What are some of the ways that can be satisfied? And in particular, the applicants say that that can be done, let me find you the actual site for that. That can be done by hosting a web presence. This is back on 119, Your Honors, where we looked before. This link, and it's in the second full paragraph under remarks, referring to a communications link through equipment of the third party. How can that be done? It can be made, for example, by the third party resending data it receives from the customer or from the vendor to the other party, or by the third party hosting on its equipment an internet presence of the vendor, e.g., a worldwide website of the vendor or an email address of the vendor. So specific examples given in the prosecution. And the other side, I believe, if I'm calling correctly, they can correct me if I'm wrong, argues that this is just an optional function and that the two aren't mutually exclusive. Well, they're not mutually exclusive. Somebody could also provide internet access as part of the method. There's no dispute, actually, about that. The question is whether they have to. Right. This is a disclaimer argument. This is... Well, he says e.g. these. Doesn't that suggest that they don't have to and that they're just optional? Sure. Absolutely. These are optional examples. You don't have to do these either, just like you don't have to provide internet access. All the applicant is saying here is this phrase. I'm not giving you some examples of the way of what would satisfy this element of the claim. And the examples given don't have anything to do with providing internet access. So your take on this is that the universe of communications links extends beyond providing access to the internet. Clear. Clear. And the applicant said as much here explicitly. So that's really the second piece of the prosecution history, I think, that's relevant in terms of whether there's a disclaimer here. The third piece is in the 994. Now, and this was covered in the briefs, but I wanted to highlight it here. This was the claim dependency issue where there was a mistake and a doubly dependent claim was written in such a way that the financial services companies were also required to be internet access providers, which, of course, the specification not only doesn't support, it contradicts. The examiner reads that and says, well, wait a minute, that's wrong because your spec doesn't support that. And this is in the record. 1367, is that? 67 and 68, exactly, Your Honor. The specific reference is the language in the examiner's on 1368, where if I can skip down to about the fourth line, the examiner says if claim 109 is dependent on claim 95, the company offering financial services to customers also provides access to the internet for customers. However, applicant specification discloses internet access providers, telephone companies and cable television companies as examples of companies providing customers with access to the internet. In other words, your spec doesn't say that these financial services companies can provide access to the internet and so this dependency is wrong and I'm going to interpret it as such. Now, this court previously in the Rambis case, for example, which we cite, has relied on evidence of, and this is obviously contemporaneous, of what the examiner thought at the time as showing that there was not a disclaimer. How could there be a disclaimer? The examiner actually understood the specification exactly the same way that we do, and that we've argued, we argued to the district court, unfortunately not successfully, and that we've argued in our briefs here. Last point on the prosecution history, and I see we've burned a lot of time here and I think I'll reserve the rest of my time, the 221 prosecution history, so the parent, okay, and this gets to the point of the family of patents argument. There are five patents here that stem from the original application. Two of the patents clearly have claims that are drawn to internet access providers. The claims say so. Two of the claims, or patents, excuse me, clearly are not limited to internet access providers. The claims clearly say so. That's the patents in this case, the 739 and the 008. And if you look at the 994 claims, you've got sort of a hybrid. You have a patent where there are claims in the same claim that uses the phrase third party, which is the phrase in these claims at issue, and it uses the phrase internet access provider to refer to something different. So if you look at, and here again the Rambis case actually relied on the overall scheme of a family of patents to show that there couldn't be any disclaimer in the particular patent at issue, because if you look at the way the terms were used across the family, it was absolutely consistent and absolutely clear that these were different terms. Let me stop there. If I can, unless there are questions, then I'll reserve. Thank you. Actually, why don't we do this? We'll give Mr. Shurkin back an extra couple of minutes since we took so much of his time with our questions, and we'll give you if Mr. Jones, if you could add two minutes to Mr. Chu's time just to even it up. Go ahead. Good afternoon. May it please the court, Morgan Chu on behalf of eBay and PayPal. This case involves two internet business method patents. We know that from the title. The title of both is internet billing method. We have to put the context of the overall invention before us. The alleged invention involves three parties. Number one, the customer, who may want to buy a book. Number two, the vendor, who may want to sell a book, such as Amazon.com. And third, plainly, an internet access provider, referred to often in the patent as the provider or the third party in the claims. And the goal, of course, is that the customer doesn't have to send his or her credit card or other account information over the internet, but could provide it to the internet service provider by telephone or otherwise. It is in that context that we look at a family of five patents, three of which clearly have all three parties, customer, vendor, and internet access provider, including the 994 patent. Those terms are used. In the two patents at issue here, instead the applicant comes up with a phrase that appears nowhere in the written specification. It is as content-free or flexible as can be, given the fact that those words together are not used. That phrase is providing, quote, a communications link through equipment of the third party. The argument along with part of the argument on appeal was, well, let's just take it out of context. Let's just look at two words, communications link, and everybody knows what that means. The test, of course, is otherwise. The test is, what does a person of skill in the art at the date of the application consider those words to mean in the full context? And I would submit that a person of skill in the art wouldn't know, might have some guesses, might be able to speculate on what, quote, a communications link through equipment of a third party might or might not mean. And therefore, this is precisely the kind of case where we are taught, we look at the written description to see what was the invention, what was in the possession of the mind of the inventor, in order to interpret the claims. And as this Court has noted in a number of cases, sometimes there is a fine line between using the written description to identify and define the claims, and then arguments based on a somewhat different body of case law, looking to see whether there's an importation of a limitation from the specification into the claims. But we focus on this one phrase. And what guides us? Well, C.R. Bard, as an example, says, let's look to the summary of the invention. Because that is one place where we are highly likely to see the invention as a whole being described. And there at the bottom of column one, there's a description of the basic objects going into column two. And then there is a full paragraph starting, I believe it's about 217. And then we go to those exact words, noting that this is under summary of the invention. It is not under a heading which we frequently see that would be called preferred embodiment or examples of embodiments. Quote, these and other objects and advantages of the present invention are achieved by an object. And then it goes on to describe activities of the provider. And then if you go down to column two, line 27, a few lines lower, there's the following sentence quote. The provider creates access to the internet for the customer through the provider's equipment. So we know that third party, not the customer, not the vendor, but the third party, is providing access to the internet for the customer through the provider's equipment. That is a description of the invention as a whole. It's part of a paragraph that refers to the present invention. And note that two paragraphs lower, column two, line 49, begins quote, the present invention in a preferred embodiment. So it's very clear that the applicant knew who had to have a general description of his claimed invention. And then not surprisingly, at a certain point, he becomes more specific to describe a preferred embodiment. Now, I want to look at one other part about that phrase, quote, communications linked through equipment of a third party. And that's the following. We know from the prosecution history that there was an intent to broaden that. This is in the 008 patent in suit, its prosecution history, to use the phrase a communications link over the internet without referring to equipment. So that just rises to the question, how does the applicant describe equipment in the written description? Another way to look at the question, what's the difference between the following words, providing communications between the customer and the vendor, and the actual words of the claims, which is providing a communications link through equipment of a third party? Because the arguments of the appellant are basically, we should interpret this much longer phrase to be roughly the same as saying communications, communications of any kind. An example might be hosting a website. It doesn't have to be necessarily through equipment. Or perhaps they're saying that somehow it would be decisive as to whether the alleged infringer, the third party, is using equipment for a website or is using someone else's equipment. Because as we all know today, many companies, large companies, Fortune 500 companies, have websites that they host in our common parlance, but they don't use $1 of their own equipment doing it. So let's look at equipment. And I think this is important. Column 1, first place it appears is about line 23. There's a sentence. These providers, again referring to Internet access providers, these providers invest in the equipment needed to provide access to the Internet for subscribers who pay the providers a fee for access. It's very clear how equipment is being used there. Next, still column 1, about line 30. Quote, a party designed to connect to the Internet by means of a provider typically connects via a modem over a telephone network to the provider's equipment, which then connects the party through the provider's equipment to the Internet. Again, use of the word equipment used by the third party provider for the purpose of connecting to the Internet. Column 2, now in the summary of the invention, at about line 26, the provider creates access to the Internet for the customer through the provider's equipment. Same formula being met. Another example, column 3, the paragraph beginning line 6. Once the prearrangement, and by the way, the prearrangement refers to the prearrangement between the customer and the third party, the Internet access provider. Quote, once the prearrangements have been completed, using the provider's service to connect to the Internet typically involves calling a telephone number of the provider and being automatically connected through the provider's equipment to the Internet. Mr. Chu, if your argument is that providing a communication link through equipment of a third party means providing Internet access, what do you make of dependent claim 7, which says wherein the communication link is over the Internet? Does that suggest that the communication link as set forth in claim 1 might be broader? It may suggest that. So several points, Your Honor. As we all know, there are different canons of claim construction. They rarely ever all line up in one direction, particularly when we get to claim differentiation and words get arranged and rearranged in the claims. Second, the oddity about this claim, but not directly at issue in this appeal, is that when we look at the subsection B, C, D, and E of claim 1 as an example, we're missing references to the Internet. We see it in the preamble, and we know the arguments pro and con about what that might mean or not mean. We do see it in A, and if you look at this family of five, three impacts, not an issue here, what the applicant is doing is moving the reference to the Internet around to different places. So just focusing mainly on Your Honor's question, I could parse B perhaps to be equipment of any kind, communications of any kind, use of a telephone, use of a television set. If my eyebrows are looking at the home shopping network. So maybe that's what was contemplated to try and broaden it, and then seven was tacked on just to make it narrower. It doesn't control. It's not decisive, obviously, and I don't think it adds much to our mix. Could you turn to, if you're done discussing the specification, could you talk a bit, I know the District Court didn't focus on the prosecution history, but could you talk particularly about the portion of the prosecution history on page 119? It's one of the places it shows up. Sure. This is the portion that Mr. Schorkenbach was talking about that has the EGE language in it. Okay. So you may have a different page. It shows up, let's see. Also, I think. Yeah, I do see it in 119. There are two parts there, and maybe I'll address both. There's the one that's part of the third full paragraph under remarks, and it says this link can be made, for example, by the third party. Yeah. Resending data it receives from the customer or from the vendor to the other party, or by the third party posting on its equipment in the internet presence of the vendor, e.g., a worldwide website of the vendor or an email address. Okay. Point number one. As I think appellants counsel admitted, they're not mutually exclusive. This can be an added service. And then the question is, let's suppose I sharpen that language, because appellants counsel said in their brief, as well as today, words to the effect, well, it's not a model of clarity. Those weren't the exact words. That was the concept. But let me give him a much stronger case. Let's say these remarks were more poignant, and it said that exact phrase, that issue, a communications link provided through equipment of a third party, I, an applicant, I intend that to mean that someone can infringe this claim only by hosting a website. Anyone. Someone doesn't have to provide internet access. There's a question of law, and this Court has addressed it. And that is, can an applicant, particularly in later applications, recognizing that the earliest of the 739 and 008 applications was in 2000, after eBay existed, after PayPal existed, can the applicant then effectively erase longstanding law about interpreting claims from the written description by making self-serving statements to broaden the meaning of words in the ongoing prosecution of later applications? And this Court has said no. And the problem is that at the same time, the applicant broadens claim language. It doesn't touch the written description, but has broader claim language that can be interpreted as being consistent with the broader language used in the prosecution history. That question might have two different components to it. I'll take one component where the claim language is crystal clear. It's sharp. There's no dispute about what it means. There's no ambiguity. And in that circumstance, it's probably not a question of whether there is or isn't an infringement. I'm going to assume that the accused product or service of the infringement of that language. Excuse me? It turns into a validity question. Absolutely. It's the Liebel problem. Absolutely. Liebel 1 and 2. Right. That's not our case here. Instead, we have this lovely piece of marshmallow grouping of words that's ambiguous. I think it's a studied ambiguity to come up with a phrase that's used nowhere in the written description in order to argue at some later point in time. And it's in that second kind of case, embraced within your Irish question, that one really looks first to the written description to understand what the claims are. That's exactly what the district court did here. Thank you very much, Your Honors. Thank you. Mr. Irish, you're coming back? Let's take the last argument first, Your Honors. I mean, the suggestion that my client lartered the prosecution history after the fact to try to get helpful language to cover eBay's products is ridiculous. There is absolutely no support for that. It's creative and may have some surface appeal, but it's false. Okay? We dealt with that in our brief, and we shouldn't get it going in the wrong direction because it was repeated here today. Second law. They have now changed their argument from even what it was in their reply brief before you today. Now they're not. They've given up on specification disclaimer. Now they're trying to say that the claim language is ambiguous, and therefore you have to look at it. And, of course, this court's case law says, if indeed it is ambiguous, you go to the specification and you use the specification as a guide to what the best and true meaning is. This language is not ambiguous. Even the district court, in going their way to some degree, never suggested this language was ambiguous. In fact, to the contrary. The court said, I read it. I understand it. It has an ordinary meaning. It has a broad meaning. And, therefore, that meaning is clearly broad enough to cover defendant's activities. That's what the court said. And that part is correct. And then the court went off and was persuaded that there was a disclaimer in the specification, which, for the reasons in our briefs, is simply not this case. And as a useful contrast, counsel mentioned the Bard case. He actually didn't discuss the facet of the Bard case. If you look at the Bard case, and I invite the court to do that. In fact, some members of this court are familiar with it because they were on the panel. I've been on a number of Bard cases. Are you talking about the one that Judge Mayer and Judge Newman and I were on, or a different one? This is, I will tell you. There's one back around 157 F. 3rd or something. No, it's not that. Not that recent? This is one. This goes back farther? This is, Judges Michelle Newman and Prost. This is Bard versus U.S. Surgical. Okay, that's a different one. All right. Okay, which is the one that appellees cite as one of their lead cases. If you read that case, and there was a disclaimer in that case. Why was there a disclaimer? Every embodiment in the specification had to do with a hernia plug, a plug you put in to try to stitch the tissue together. Every single embodiment in the specification had this requirement of pleats. The debate was over whether pleats were required. Not so here. In our case, clearly we've got financial services companies that are providing Internet access. Okay? Fundamental distinction. Number two. In fact, in that case, the court went so far as to say the specification defined the plugs at issue to have pleats. Not so here. Number three. In that case, in the Bard case, the prior art was repeatedly distinguished during prosecution on the basis of not having pleats. Nothing like that here. Where in this prosecution history did this applicant say, you've got to provide Internet access. The person who's performing the Internet billing method. And this, Pat, I do agree with counsel where he began. This, Pat, is about an Internet billing method. It's not about providing Internet access. Mr. Schorkenbeck, if providing a communication link between the purchasing customer and the selling vendor is not the Internet, what is it? It could be done over dedicated lines. It could be done over, in fact. Is there anything in the, anywhere in this intrinsic record that provides us with some guidance as to what it might be other than the Internet? Well, the, yes. The, when the specification, I'll see if I can put my hands on the site. But when the specification talks about the, let me just back up for a minute. So you've got three people in this method. Customer, vendor, trusted intermediary. The trusted intermediary is the person dealing with the sensitive stuff. They get the financial details that people don't want to have exposed. When they're actually getting authorization from, say, another party, a bank whose account is going to be charged, or the customer's account that bank's going to be charged, there's disclosure in the specification about using secure lines of communication, not using the Internet for that purpose. And, in fact, banks, when they're sending your financial information or mine around, they're not using the Internet. They're using their own secure networks. So there is disclosure in the specification about other modes you can use other than the Internet. But with all due respect, gentlemen, I don't think the question is whether you could use something other than the Internet entirely to perform the method. The question is whether using the Internet, that the access to it has to be provided by the person who's the trusted intermediary. We all agree that the method generally involves the Internet. The question is whether, in addition to me being the trusted middleman and brokering the transaction, do I actually have to provide the access for every customer? And the specification, in our view, as we explained in the brief, clearly suggests that you don't have to. The financial services companies don't have to do it at all. The cable and telephone companies are disclosed as maybe getting into it, maybe not. There is certainly, I mean, I think you would not disagree with this proposition that the language in the summary of the invention and early on in the specification is certainly not the most helpful to your folks. It looks very restrictive. I think we can all agree. It does, but one last point on that, if I may. You'll notice in the briefs in an argument, counsel always starts about two or three objects in to the summary of the invention when they talk about the present invention. You look at the very first object of the invention, which is at the bottom of column one, not column two, column one. The main object of the present invention is to create a new business opportunity for telephone companies, cable television companies, existing Internet access providers and companies offering financial services by creating a way for them to offer to their subscribers a method of securely buying and selling goods or services of any value over the Internet. You alluded a moment ago to one difference between your view of the case and Mr. Chu's view of the case as being Mr. Chu is talking about the, for lack of a better term, the definitional value of the specification with respect to claim language. You talk about it in terms of disclaimer, and of course it's easy to know why you prefer the disclaimer and he prefers the idea of definition. Because the standard is so much higher for disclaimer. But it's not always so easy to tell which is which when you look at them and try to decide which of the two applies. I agree with that fully, and I think in one other point I think it would be useful for us to talk about. This whole debate over the present invention, right, like this is some magic phrase that if a patentee uses the present invention, automatically we're looking at a possible or a likely disclaimer, and the question is only how broad it goes. That is not the law. And your honors know that because, again, you collectively have been on cases on both sides of it. You read all these cases, and I did. There's 15 of them, right? They cite some, we cite some. They all have this language, the present invention. Some there's a disclaimer, some there's not. It's always fact specific. And with all due respect, in this case we think we're comfortably on the right side of the line. Very well. Thank you, and we thank both counsel for a helpful argument. Thank you. Thank you. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock a.m.